UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

ESTEBAN AYALA-ZUNIGA
a/k/a Esteban Ayala,

Defendant.

REPORT & RECOMMENDATION

05-CR-6097T

**PRELIMINARY STATEMENT**

By Order of Hon. Michael A. Telesca, United States District Judge, dated January 25, 2006, all pre-trial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 31).

Defendant Esteban Ayala-Zuniga (hereinafter "Ayala") is charged in a single-count indictment. Specifically, the Indictment charges that on January 27, 2005, Ayala, a citizen of Mexico who had previously been removed from the United States following a conviction for an aggravated felony, was found in the United States without having obtained the consent of either the Attorney General or the Secretary for Homeland Security, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). (Docket # 9).

Currently pending before this Court for a Report and Recommendation are Ayala's motions to dismiss the Indictment and to suppress statements. (Docket # 13).[1] An evidentiary hearing was held on November 8, 2005, relating to Ayala's motion to suppress. During the hearing, the government presented the testimony of Officer Jason Blanchard of the Rochester Police Department and Special Agent Robert Lucas of the Immigration and Customs Enforcement Agency ("ICE"). The defense called no witnesses. Set forth below are this Court's recommendations on Ayala's pending motions.

## FACTUAL BACKGROUND

The testimony presented by Officer Blanchard and Special Agent Lucas was consistent in many respects. In addition, each witness provided testimony describing his unique role in the investigation of the events at issue in this matter. Based upon the credible testimony presented to this Court, I find the following facts.

On January 27, 2005, Blanchard assisted a fellow officer, Officer Wilcox, as he conducted a traffic stop of a large sport utility vehicle ("SUV"), bearing a Texas license plate, near the intersection of Mt. Read Boulevard and Buffalo Road. (Tr.7, 13).[2] Wilcox initiated the stop because the vehicle had illegally tinted windows. (Tr. 7, 13). Once the vehicle was stopped, the officers approached the vehicle and spoke with its two occupants; Wilcox spoke with the

---

[1] Ayala's omnibus motion also sought, *inter alia*, *Brady* material, *Jencks* material, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence and the immediate disclosure of the government's expert witnesses. (Docket # 13). Each of these requests was either resolved by the parties or decided in open court by the undersigned on October 4, 2005. (Docket ## 18, 19).

[2] The transcript of the hearing conducted on November 8, 2005 is hereinafter referenced as "Tr. __". (Docket # 26).

driver of the SUV, and Blanchard approached the opposite side of the vehicle and spoke with the passenger, whom he identified in court as the defendant Ayala. (Tr. 8, 11). Speaking in English, Blanchard requested identification from Ayala, which he was unable to provide. (Tr. 8, 15). Upon further inquiry by Blanchard, one of the occupants of the vehicle identified Ayala as Antonio Rodriguez Tobar and stated that he was born on July 14, 1965, and had entered the United States illegally through Texas. (Tr. 9-10). Blanchard did not recall whether it was Ayala or the driver who provided this identification and information. (Tr. 15-16).

After learning that the passenger was an illegal alien, Blanchard and Wilcox contacted ICE and made arrangements to meet ICE Special Agents Lucas and Joseph Gillett in a parking area near Interstate 90 in LeRoy, New York, so that they could interview Ayala and the driver. (Tr. 10, 20). Both individuals were then placed in the rear seats of police vehicles and transported. (Tr. 11). When they arrived, the ICE agents took custody of them and spoke to them primarily in Spanish. (Tr.20, 29).

Before he began speaking to the detainees, Lucas knew from the earlier telephone call that both had "admitted to being illegally in the United States." (Tr. 19). He also knew that no immigration record existed for the individual identified as Antonio Rodriguez Tobar. (Tr. 20). The first question he asked them was whether they were illegally in this country. As he testified, he and Gillett both stood at the rear of Gillett's car in which Ayala and the driver were sitting and simultaneously asked, "Are you two illegally in the United States?" (Tr. 20, 27). Both individuals responded with "a simple yes." (Tr. 20, 28). Following that exchange, they were driven to the Buffalo Federal Detention Facility, located in Batavia, New York. (Tr. 21).

At the detention facility, Lucas processed Ayala (who at that time was identified as Tobar),[3] and Gillett processed the driver of the SUV. Lucas obtained "Tobar's" biographical information, including his name, date of birth, place of birth, parents' names, and how and where he entered the United States. (Tr. 21). "Tobar" reported that he had been born on July 14, 1965, and had entered the United States through Texas on May 1, 2002. (Tr. 21-22). Lucas also entered "Tobar's" fingerprints into a computerized fingerprint database. The database identified the fingerprints as belonging to an individual named Esteban Ayala and provided an FBI number. (Tr. 23-24). A records check of that FBI number yielded two sets of records, one from the state of New York for the name Jose Aqueri and the other from the state of Texas under the name Estaben Ayala, with a date of birth of November 28, 1966. (Tr. 25).

Lucas returned to Ayala and asked him for his "true and correct name." Ayala then admitted that his name was Esteban Ayala. (Tr. 25). Upon learning Ayala's true identity, Lucas advised him of his legal rights. Ayala responded by requesting to speak with an attorney, at which point Lucas discontinued his questioning of Ayala and continued to process him. (Tr. 26). During cross-examination, Lucas explained that the purpose of his questions regarding Ayala's name and date of birth was to "obtain . . . sufficient information to put him before an Immigration Judge, an administrative deportation or removal proceeding." (Tr. 31).

Lucas further testified that it is a crime for someone to enter the United States without an inspection by an immigration officer[4] and that venue for prosecution of such crime

---

[3] During the hearing, Special Agent Lucas positively identified the defendant as Esteban Ayala. (Tr. 25).

[4] 8 U.S.C. § 1325(a) makes it a criminal offense for any alien to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers."

lies only in the district in which the individual entered the country.[5] (Tr. 31-32). As Lucas explained, an individual who has entered the United States without inspection may, however, change their alien status to a lawful one. (Tr. 33). In other words, the mere fact that an individual entered the United States without inspection is insufficient to prove that such individual is still in the country illegally. Rather, further investigation would need to be conducted, including a review of immigration records, to determine whether that person's status as an unlawful alien had changed. (Tr. 33-34).

According to Lucas, no immigration records existed relating to the name Antonio Rodriguez Tobar. (Tr. 34).

## REPORT AND RECOMMENDATION

Ayala moves to dismiss the Indictment charging him with unlawfully re-entering the United States following deportation on the grounds that his prior deportation was unlawful. (Docket ## 13, 23). Ayala also moves to suppress all statements made by him to Special Agent Lucas on January 27, 2005.[6] According to Ayala, such statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). (Docket ## 13, 28). The government opposes each of

---

[5] Contrary to Lucas's testimony, 8 U.S.C. § 1329 provides that prosecutions for illegal entry without inspection under 8 U.S.C. § 1325 "may be instituted at any place in the United States . . . at which the person charged with a violation under section 1325 . . . may be apprehended." 8 U.S.C. § 1329.

[6] Ayala also moved to suppress the earlier statements he made to Officer Blanchard on January 27, 2006. At the suppression hearing, the government conceded that Blanchard was unable to attribute any specific statements to Ayala (as opposed to the driver). Thus, the government indicated that at trial it will only seek to introduce statements made by Ayala to Special Agent Lucas. (Tr. 41; *see also* Letter from Assistant United States Attorney Tiffany Lee, dated January 30, 2006).

Ayala's motions, asserting that Ayala's prior removal was lawful and that his statements are properly admissible. (Docket ## 17, 22, 29).

## I. <u>Ayala's Motion to Dismiss the Indictment</u>

As described above, Ayala is charged with a single count of being found in the United States without having obtained the necessary permission to re-enter after having previously been deported following a conviction for an aggravated felony, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). (Docket # 9). Ayala moves to dismiss the Indictment by challenging the legality of his deportation. Ayala contends that the removal proceedings were defective because he was not adequately advised of his legal rights, including his right to an attorney and his right to seek relief from removal. (Docket # 13).

**A. <u>Due Process</u>:** It is well-settled that aliens are entitled to due process of law during deportation or removal proceedings. *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 (1987) ("a collateral challenge to the use of deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review"); *Shaughnessy v. Mezei*, 345 U.S. 206, 212 (1953) (deportation proceeding must satisfy due process of law). *See also United States v. Fernandez-Antonia*, 278 F.3d 150, 156 (2d Cir. 2002). However, "[b]ecause removal proceedings are civil rather than criminal, various due process protections normally associated with criminal trials are not required." *Id.* (citing *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984); *United States v. Valdez*, 917 F.2d 466, 469 (10th Cir. 1990)).

An alien seeking to challenge the validity of a deportation order in a prosecution under 8 U.S.C. § 1326 must demonstrate that "(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). *See United States v. Mendoza-Lopez*, 481 U.S. at 838-39; *United States v. Fernandez-Antonia*, 278 F.3d at 157 (section 1326(d) codifies the Supreme Court's holding in *Mendoza-Lopez*).

Here, the government contends that Ayala cannot satisfy the first and second requirements because he waived his right to contest the deportation order. The government also contends that Ayala cannot establish the third requirement – that the removal proceeding was fundamentally unfair – because he did not in fact qualify for any potential relief from removal at the time of his deportation. Because I agree that Ayala has failed to satisfy the fundamental unfairness requirement, I need not and will not determine whether Ayala has satisfied the other requirements under § 1326(d). *See Fernandez-Antonia*, 278 F.3d at 157 (court declined to address first two requirements based upon finding that deportation order was not fundamentally unfair).

**B. Fundamental Fairness:** Ayala contends that his deportation hearing was fundamentally unfair because the immigration judge failed to inform him of various rights, including his eligibility for relief from removal. Such claim, however, is without merit. (Docket ## 13, 23).

In *Fernandez-Antonia*, the Second Circuit rejected a claim similar to the one advanced by Ayala here. In that case, the defendant was convicted of unlawfully re-entering the

United States after having been deported. The defendant sought dismissal of the indictment, claiming that his removal hearing was fundamentally unfair and thus could not form the basis of an illegal re-entry charge under 8 U.S.C. § 1326. Specifically, the defendant argued that the immigration judge violated his due process rights because the judge failed to advise him that he was eligible for discretionary relief under § 212(h) of the Immigration and Nationality Act ("INA"), a statute which afforded discretionary relief from deportation to an alien whose family includes a United States citizen and whose deportation would result in extreme hardship to the citizen family member. *Fernandez-Antonia*, 278 F.3d at 160; 8 U.S.C. § 1182(h).

For purposes of the appeal, the Second Circuit accepted the district court's assumption that the defendant had not been advised of his right to seek relief under § 212(h). *Fernandez-Antonia*, 278 F.3d at 157. The court nonetheless rejected the defendant's argument that dismissal of the indictment was warranted, finding that he had not been prejudiced by the alleged procedural flaw in his removal proceeding. According to the Second Circuit, an alien challenging an order of deportation must show "not only that he was effectively deprived of his right to direct appeal, but also that the administrative proceedings were fundamentally unfair in some respect that would have entitled him to relief on direct appeal." *Fernandez-Antonia*, 278 F.3d at 157 (quoting *United States v. Fares*, 978 F.2d 52, 57 (2d Cir. 1992)).

In *Fernandez-Antonia*, 278 F.3d at 159, the court found that although the defendant was technically eligible for § 212(h) relief, he would not have been able to demonstrate the requisite "extreme hardship" necessary to obtain such relief. Thus, even absent the procedural flaw, the defendant still would have been deported and therefore was not entitled to dismissal of the illegal re-entry charge. *Fernandez-Antonia*, 278 F.3d at 161. *See United*

*States v. Paredes-Batista*, 140 F.3d at 379 (rejecting challenge to collateral attack on deportation order because order would have been upheld even without procedural flaw); *United States v. Fares*, 978 F.2d at 58 (same).

Application of *Fernandez-Antonia* to this case dictates denial of Ayala's motion. Ayala, like the defendant in *Fernandez-Antonia*, claims that his removal proceeding was procedurally flawed because the immigration judge failed to inform him of various legal rights. Based upon the above-cited authority, however, Ayala must show more than that his removal proceeding was procedurally flawed; he must also show that absent such a flaw, he might not have been deported. *Fernandez-Antonia*, 278 F.3d at 157, 159; *Paredes-Batista*, 140 F.3d at 378; *Fares*, 978 F.2d at 58. This Ayala cannot show.

While *Fernandez-Antonia* makes clear that Ayala must prove more than the existence of a procedural flaw, this Court is not persuaded that he can do even that. The defendant in *Fernandez-Antonia* was plainly eligible for § 212(h) relief, and the immigration judge failed to advise him of the existence of that avenue of relief. For the reasons discussed below, Ayala, by contrast, was ineligible for relief from removal. It is thus difficult to grasp how the judge's failure to inform Ayala of the existence of discretionary relief for which he was not eligible could be viewed as an error or flaw of any sort.

**C. Ayala was Ineligible for Relief from Removal:** Even if this Court were to find that Ayala's deportation proceeding was procedurally flawed due to the immigration judge's failure to advise him of his legal rights, including the possibility of relief from removal, Ayala has not demonstrated, as he must, that even after a procedurally perfect removal hearing, he would not have been deported. *Fernandez-Antonia*, 278 F.3d at 159.

During oral argument of Ayala's motions, the Court directed the parties to submit supplemental memoranda of law addressing the fundamental fairness of Ayala's deportation proceeding. In his supplemental memorandum, Ayala specifically references INA § 212(c) relief as the relief he would have sought prior to deportation had he been advised of his legal rights. (Docket # 23).

Prior to the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") on April 24, 1996, a deportable alien was eligible to apply for a discretionary waiver of deportation under INA § 212(c). To be eligible for § 212(c) relief, the alien must have been a lawful permanent resident and must have resided in the United States for seven consecutive years. *See*, *e.g.*, *I.N.S. v. St. Cyr*, 533 U.S. at 295 (citing 8 U.S.C. § 1182(c) (repealed 1996)). Congress amended § 212(c) in 1990 to exclude from § 212(c) relief those aliens who had been convicted of an aggravated felony and had served at least a five-year term of imprisonment. *Id.* at 297. An aggravated felony was defined by INA § 101(a)(43)(F) as a crime of violence (defined by 18 U.S.C. § 16 to include a crime that has as an element the use, attempted use or threatened use of force) for which the term of imprisonment was at least one year.

In 1996, Congress again modified the class of aliens eligible for § 212(c) relief, this time excluding those convicted of, *inter alia*, aggravated felonies or drug-related crimes. *See id.; Carmona-Richardson v. I.N.S.*, 2002 WL 31175216, *3 (S.D.N.Y. 2002) (citing AEDPA § 440(d), 8 U.S.C. § 1227). Later that same year, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which repealed § 212(c) entirely and replaced it with a new provision known as "Cancellation of Removal," which also excludes from

eligibility aliens who had previously been convicted of an aggravated felony. *See St. Cyr*, 533 U.S. at 297; 8 U.S.C. § 1229b(a).

Section 212(c) relief may still be available retroactively under certain defined circumstances. In *St. Cyr*, 533 U.S. at 289, the Supreme Court held that § 212(c) relief remains available for aliens who, prior to the effective dates of the AEDPA and IIRIRA, pleaded guilty pursuant to plea agreements to crimes that would render them ineligible for relief under the AEDPA and IIRIRA, provided that they would have been eligible for relief under § 212(c) under the law in effect at the time of their pleas. *Id*. at 326. In reaching this conclusion, the Supreme Court reasoned:

> Prior to AEDPA and IIRIRA, aliens like St. Cyr had a significant likelihood of receiving § 212(c) relief. Because respondent, and other aliens like him, almost certainly relied upon that likelihood in deciding whether to forego their right to a trial, the elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect.

*Id.* at 325.

Here, the government has represented, and Ayala has not contested, that Ayala was not a lawful permanent resident of the United States, that he was convicted of an aggravated assault on March 9, 1994 pursuant to a guilty plea and that he was sentenced to an eight-year term of imprisonment. (Docket # 17, Ex. 1). Although it is unclear from the record exactly when Ayala began to serve his sentence,[7] it appears that it had been less than five years before an order of removal was served upon him on March 11, 1999. (Docket # 22, Ex. 1). Because such

[7] It appears that Ayala pled guilty to the charge of aggravated assault on March 9, 1994, and was sentenced to a term of probation. Thereafter, Ayala was arrested for violating the conditions of such probation and, on December 8, 1994, was sentenced to an eight year term of imprisonment based upon the original charge.

removal was predicated upon a guilty plea for an aggravated felony entered in 1994 when § 212 relief was available, Ayala would have been entitled to seek retroactive § 212(c) relief, if he was otherwise eligible. As stated above, Ayala must now demonstrate not only that the removal proceedings were procedurally flawed, but also that absent such flaw, he might not have been deported. *Fernandez-Antonia*, 278 F.3d at 157. Put simply, he must show at least that he would have been eligible for § 212(c) relief had he applied for it during the deportation proceeding. He cannot make this showing.

Although it appears that Ayala resided in the United States for many years prior to his deportation, he was not a lawful permanent resident and therefore could not satisfy the first requirement for § 212(c) relief. Thus, he simply did not satisfy the requirements for § 212(c) relief. As a result, even if Ayala could demonstrate that his removal hearing was procedurally flawed, because he was ineligible for relief under § 212(c) and would have been deported in any event, he cannot show that he was prejudiced by the allegedly flawed procedure.[8] It is therefore my recommendation that Ayala's motion to dismiss the Indictment based upon his challenge to the validity of his deportation order be denied.

## II. Ayala's Motion to Suppress Statements made to Special Agent Lucas

Ayala moves to suppress all statements he made to Special Agent Lucas while in the parking area on Interstate 90 and during the subsequent interview at the Buffalo Federal

---

[8] To the extent Ayala also claims that he was prejudiced by the failure of the immigration judge to advise him of the right to claim Temporary Protected Status under to 8 C.F.R. § 244, such claim is also unavailing. Section 244.4 provides that an alien is ineligible for Temporary Protected Status if he has been convicted of a felony. Because Ayala had been convicted of a felony, he was ineligible for Temporary Protected Status.

Detention Facility. According to Ayala, such statements are inadmissible because Lucas did not first advise him of his *Miranda* warnings. (Docket ## 13, 28).

In *Miranda v. Arizona,* 384 U.S. at 444, the United States Supreme Court held that the government may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that privilege. As framed by the Second Circuit,

> [c]ustodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures sought (the investigative intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)). Here, the government concedes that Lucas did not advise Ayala of his *Miranda* warnings before the statements at issue were made. (Docket # 29 at 4). The government also does not dispute that Ayala "was 'in custody' for the purposes of the *Miranda* inquiry." (Docket # 29 at 4). Thus, the sole issue remaining for determination is whether Ayala's statements were the product of interrogation.

"Interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation includes direct questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police

should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992).

In this case, Ayala was riding in the passenger seat of an SUV with illegally tinted windows when he was subjected to a traffic stop. (Tr. 7, 13). Two officers approached the vehicle, one on each side. During the ensuing conversation, Officer Blanchard requested that Ayala provide identification, which he was unable to do. One of the occupants of the vehicle then falsely indicated that Ayala's name was Antonio Rodriguez Tobar, that he was born on July 14, 1965, and that he had entered the United States illegally through Texas. (Tr. 10).

Following the disclosure of this information, Ayala and the driver of the SUV were placed in the rear seat of a police car as the officers made arrangements with ICE agents to meet at a location on Interstate I-90. (Tr. 9-10). When they arrived at that location, ICE Special Agents took Ayala and the SUV driver into custody. (Tr. 20). While they were still in the police car, Special Agents Lucas and Gillett asked them, "Are you two illegally in the United States?" (Tr. 20, 27). According to Lucas, both individuals responded with "a simple yes," after which they were transported to the Buffalo Federal Detention Facility. (Tr. 20-21, 28).

At the detention facility, Lucas conducted an interview of Ayala, who identified himself as Tobar. (Tr. 21). Specifically, Lucas asked Ayala for his biographical information and how and where he entered the United States. (Tr. 21). Ayala responded that he was born on July 14, 1965, and that he had entered the United States through Texas on May 1, 2002. (Tr. 21-22). Lucas also submitted Ayala's fingerprints for analysis and discovered a record from the state of New York under the name Jose Aqueri and a record from the state of Texas under the name Esteban Ayala, with a date of birth of November 28, 1996. (Tr. 23-25).

Armed with this new information, Lucas returned to Ayala and asked him for his "true and correct name." At this point, Ayala truthfully identified himself. (Tr. 25). Thereafter, Lucas advised Ayala of his *Miranda* rights, and Ayala requested the assistance of counsel. (Tr. 26). As a result of Ayala's request, Lucas discontinued his questioning and resumed the processing of Ayala. (Tr. 26).

The government contends that the majority of the questions posed by Lucas were designed to obtain Ayala's biographical information and thus need not have been preceded by *Miranda* warnings.[9] *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (generally exempt from the *Miranda* requirement are questions designed to secure "biographical data necessary to complete booking or pretrial services"); *see also Rosa v. McCray*, 396 F.3d 210, 221 (2d Cir. 2005) ("collection of biographical or pedigree information . . . does not ordinarily implicate the prophylactic protections of *Miranda*"); *United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992) ("solicitation of pedigree information normally does not amount to custodial interrogation"); *United States v. Minkowitz*, 889 F. Supp. 624, 626 (E.D.N.Y. 1995) ("solicitation of arrestee's identity and background *normally* does not amount to custodial interrogation"). The booking exception is, of course, "not absolute," *Thompson v. United States*, 821 F. Supp. 110, 120 (W.D.N.Y. 1993), *aff'd* 35 F.3d 100 (2d Cir. 1994), and it requires consideration of the totality of the circumstances surrounding the questioning. *United States v. Minkowitz*, 889 F. Supp. at 627 (citing *United States v. Casiano*, 862 F. Supp. 52, 54 (S.D.N.Y. 1994)).

---

[9] The government has conceded that Lucas reasonably should have known that his question concerning how and where Ayala entered the United States reasonably would lead to an incriminating response. (Docket # 29 at 8). Thus, it has represented that it will not seek at trial to introduce Ayala's response to that question. (Letter from Assistant United States Attorney Tiffany Lee, dated January 30, 2006).

In determining whether questioning by a law enforcement officer falls within the booking exception, the court should consider both the nature of the information sought and whether the questioning served an investigative purpose. *Id.* (citing *United States ex. rel. Hines v. LaVallee*, 521 F.2d 1109, 1113 n.2 (2d Cir. 1975), *cert. denied*, 423 U.S. 1090 (1976); *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989)). According to the Supreme Court, the appropriate standard is whether the questions are of the type that an officer "should know are reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496 U.S. at 601 (internal quotation omitted); *see United States v. Rodriguez*, 356 F.3d at 259-60 (*Miranda* warnings not required when defendant's interview was conducted solely for purposes of determining whether defendant would be subject to administrative deportation following release from prison and where agent was unaware of potentially incriminating nature of questions relating to defendant's birthplace and citizenship); *United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002) ("Although the interview occurred at the jail, it was solely for the administrative purpose of determining whether Salgado was deportable when he got out of jail. [The agent] had no reason to believe that Salgado's statements would be incriminating.").

The majority of the questions posed by Lucas did indeed fall within the booking exception. When his agency was first contacted by Officer Blanchard, Lucas learned that two individuals were in custody and that they had "admitted to being illegally in the United States."[10] (Tr. 19). When Lucas first questioned Ayala, Ayala identified himself as Antonio Rodriguez Tobar, a name for which no immigration record existed. Under these circumstances it was lawful

---

[10] Blanchard did not testify about what, if any, information he learned about any statements made by the driver about his immigration status.

and proper for Lucas to question Ayala concerning his identity so that he could correctly identify the individual in custody and evaluate his immigration status. For these reasons, I find that Ayala's response to Lucas's queries as to his name and date of birth fall within the booking exception to *Miranda* and should be admissible.

I reach a different conclusion, however, concerning the first question posed by Lucas in the parking area on Interstate I-90. According to Lucas's testimony, when Ayala and the driver of the SUV were sitting in the police car, Lucas and Gillett asked them, "Are you illegally in the United States?" Ayala's affirmative answer was an incriminating response and one I believe Lucas should have known was reasonably likely to result from his question. At the time Lucas asked the question, he knew that the individuals being detained had admitted to other law enforcement officers that they were in the country illegally. He also knew that no immigration record existed for the individual who identified himself as "Tobar." Based upon this information, taken together, Lucas should have known that it was reasonably likely that "Tobar" not only was in the country illegally, but also had entered the country illegally – an offense under 8 U.S.C. § 1325. The fact that a decision might be made later not to charge Ayala[11] does not make the question, posed while Ayala was in custody, any less likely to elicit an incriminating response. *Compare United States v. Mata-Abundiz*, 717 F.2d 1277, 1277, 1279-80 (9th Cir. 1983) ("[i]f an INS investigator has no reason to suspect that question is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation") *with United States v. Kadem*, 317 F. Supp. 2d 239, 242 (W.D.N.Y. 2004) (questions relating to how

---

[11] As set forth *supra*, contrary to Lucas's testimony, 8 U.S.C. § 1329 confers jurisdiction to prosecute § 1325 offenses in the district in which the alleged offender is apprehended. 8 U.S.C. § 1329.

alien arrived in this country likely to lead to incriminating response because interviewing agent should have known alien had likely previously been deported and re-entered illegally); *Thompson v, United States*, 821 F. Supp. 110, 121 (W.D.N.Y. 1993) ("booking or pedigree exception 'is inapplicable . . . where the elicitation of information regarding immigration status is reasonably likely to inculpate the subject'") (quoting *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990)), *aff'd*, 35 F.3d 100 (2d Cir. 1994). Thus, I find that because Lucas reasonably should have expected his question to lead to an incriminating response, his question does not fall within the routine booking exception.[12] Accordingly, Ayala's motion to suppress should be granted as to his response to the question, "Are you illegally in the United States?" and denied as to the remaining pedigree questions.

---

[12] In support of its argument for the admissibility of Ayala's statement, the government cites *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). This case is inapposite to the matter at hand. In *Brignoni-Ponce*, the Supreme Court held that border patrol officers may, if supported by reasonable suspicion, stop a vehicle and question the driver and passengers about their citizenship and immigration status. *Id.* at 881-82. The issue before that Court, however, was whether such a traffic stop was lawful. The Court did not address the potential admissibility of the responding statements.

Moreover, in analyzing the border stop at issue, the Supreme Court analogized the stop to a traffic stop made pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, routine traffic stops are generally considered to be non-custodial, and thus answers to questions made during such stops are admissible regardless of whether the questions may have been likely to elicit an incriminating response. *See Berkemer v. McCarty*, 468 U.S. 420, 440-42 (1984) (the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of *Miranda*"); *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (acknowledging *Berkemer* holding that routine traffic stops do not constitute custodial detentions for purposes of *Miranda*); *United States v. Perez*, 2002 WL 1835601, *6 (S.D.N.Y. 2002) ("persons temporally detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*") (citation omitted).

Here, as stated above, the government has conceded that Ayala was in custody at the time he made the challenged statements to Lucas. The issue remaining is thus whether Lucas's question about whether Ayala was illegally in the United States constituted an interrogation, an issue not addressed in *Brignoni-Ponce*. Accordingly, the *Terry*/border stop analysis utilized in *Brignoni-Ponce* is inapplicable in this matter.

## CONCLUSION

For the foregoing reasons, it is the Report and Recommendation of this Court that defendant's motion to dismiss the Indictment **(Docket # 13)** be **DENIED**. It is my further Report and Recommendation that defendant's motion to suppress statements made to Special Agent Lucas on January 27, 2005 **(Docket # 13)** be **DENIED** as to statements relating to his biographical information and **GRANTED** as to his response to the question, "Are you illegally in the United States?"

**IT IS SO ORDERED.**

s/Marian W. Payson
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
February 1, 2006

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[13]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

s/Marian W. Payson
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
February 1, 2006.

[13] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).